**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:

**JESSICA GRAVES**,
    Plaintiff,

v.

**BRANDSTAR, INC.,**
    Defendant.

_____

COMPLAINT
(JURY TRIAL DEMANDED)

Plaintiff, JESSICA GRAVES, sues the Defendant, BRANDSTAR, INC., and as grounds alleges:

PARTIES

1. Plaintiff, JESSICA GRAVES, is a citizen of the United States and a resident of Broward County, Florida. At all times pertinent, Plaintiff was an "employee" as defined by the Florida Civil Rights Act of 1992, Fla. Stat. Sec. 760.01 et. seq.

2. Defendant, BRANDSTAR, INC., is a Florida corporation doing business in Broward County, Florida. Defendant is an "employer" as defined by the Age Discrimination in Employment Act, 29 U.S.C. *Sec.* 621 et seq, the Family and Medical Leave Act, 29 United States Code §2611, et seq. and the Florida Civil Rights Act of 1992, Fla. Stat. Sec. 760.01 et. seq.

JURISDICTION AND VENUE

4. This is an action arising under the Americans with Disabilities Act (the "ADA"), the Family and Medical Leave Act, and the Florida Civil Rights Act. The Court has

jurisdiction pursuant to 28 U.S.C. 1331 as this action arises under federal law, the ADA and FMLA. The Court has supplemental jurisdiction over Plaintiff's claims under the Florida Civil Rights Act pursuant to 28 U.S.C. Section 1367.

5. BRANDSTAR, INC. does business in the Southern of District of Florida and venue is proper in this district.

## CONDITIONS PRECEDENT

6. Plaintiff filed her charge of discrimination with the Equal Employment Opportunity Commission and which was co-filed with Florida Commission on Human Relations on September 5, 2018.

7. On March 20, 2020, Plaintiff received a Notice of Right to Sue from the EEOC and her suit is brought within 90 days of her receipt of the notice. Thus, her ADA claim is timely filed.

8. The Florida Civil Rights Act claim is timely in that it has been more than 180 days since the charge of discrimination was filed with the Florida Commission on Human Relations (FCHR), and the FCHR has neither issued a "reasonable cause" determination or a "no cause" determination within 180 days with respect to this charge.

## GENERAL ALLEGATIONS

9. Graves was hired in December 2016, by 3 managers whose employment was terminated by BrandStar during her tenure—Jason Gagnon (Chief Creative Officer), Susan Molke (Human Resources Manager) and Carmen Feinberg (Chief Financial Officer). All three were in agreement regarding the terms of Graves` employment at BrandStar.

10. Graves was initially offered employment by both Jason Gagnon and Susan Molke, Graves had to decline their offer due to the amount of time she would be required to be in the office and unable to work from home or tend to family obligations.

11. Shortly thereafter, Graves received a call from Mr. Gagnon advising her that she would be able to work from home as needed and that she could leave by 4:00 p.m. on the days she was in the office in order to allow her time to pick up her 2 children from school. Ms. Molke had no objection and deferred to Graves's named supervisor, Mr. Gagnon. Graves joined the BrandStar team a week later with this verbal agreement in place.

12. The latter part of the agreement (leaving the office by 4 p.m.) was no longer needed a month into Graves employment once she hired a full-time caregiver. Hiring full-time help was essential when Graves began traveling 2 to 3 times per month to film/produce/direct for both Designing Spaces and Office Spaces (a/k/a Inside the Blueprint). Her travel days often began at 11:00 a.m. and ended at approximately 1:00 a.m., only to resume at 7:00 a.m. and end at 7:00 p.m. when she filmed on location. These travel and shoot days far exceeded an 8 hour work day and the hours set by BrandStar for its on-site employees. Furthermore, many times these travel days took place on Sundays. Despite having worked on a Sunday, Graves was still expected to report to work on Monday through Friday, exceeding the 40-hour work week. The alleged punctuality and attendance issues are clearly pretextual.

13. During Graves's employment, she wrote/produced/directed/hosted and voiced segments or entire episodes of all flagship shows. Graves produced over 40 segments and shows for BrandStar. Graves provided, at no cost to BrandStar, voiceover for their shows, which is valued anywhere between $150 to 850 depending on the length of the recorded show or segment. She provided non-paid on-camera hosting for many of their shows.

14. Graves allowed BrandStar to film at her home without being compensated for the use of the location. Location fees paid by BrandStar were typically in the hundreds or the homeowner was compensated with free merchandise (i.e., Dyson vacuums, appliances, etc.).

15. While Graves was on location for a Dyson shoot, she received a call from her father in Pennsylvania that he had had suffered a seizure, and as a result, her had been taken to the hospital, and that he would be undergoing emergency brain surgery for a large tumor.

16. Ms. Graves's father lived in a remote area in Pennsylvania. Despite receiving this devastating news, Ms. Graves spent that entire day producing and directing and finished the production. She called Mr. Bettan, new supervisor and Mr. Farsi, the new creative director and told them that she planned to fly to Pennsylvania the following day to be with her father in ICU.

17. After arriving in Pennsylvania and consulting with her father's physicians, Graves realized her father would not be unable to undergo another round of radiation and chemotherapy without a caregiver.

18. Graves began making the necessary arrangements to move her father to Florida into her home in order to care for him.

19. After several days in Pennsylvania, Graves returned to Florida and meet with her employees.

20. She explained that she would have to be the primary caregiver and that her father was a Vietnam Veteran who was exposed to Agent Orange and had now been diagnosed with service-related cancer. She explained that she would be renovating her garage to accommodate him.

21. Graves then pitched a show idea to Mr. Alfieri, the CEO, which was perfectly in line with the show "Military Makeover," which provided home renovations and upgrades for disabled veterans and their families.

22. Since Graves's father was moving in with her, and she had to renovate her garage into a handicapped accessible apartment, she offered to write/produce/direct and handle the entire production of the show, which BrandStar would make a profit.

23. Graves thought that Mr. Alfieri would see the benefit to it since they had previously produced multiple stories about BrandStar's employees and their families.

24. In fact, Mr. Alfieri had just finished having his kitchen, laundry room, and mudroom renovated as part of "Mark's Big Home Makeover and Mr. Bettan had just received a brand new home security system (an expense which ran into the thousands)

25. Mr. Alfieri said he would think about Ms. Graves's pitch.

26. During this time, Ms. Graves respectfully asked both Mr. Bettan and Mr. Farsi to assign traveling shoots to other producers and local ones to her so that she could get her home ready for her father, all while balancing her workload and other producers' projects.

27. Ms. Graves anticipated the renovation and move to take less than one month.

28. On the morning Ms. Graves was terminated, she was on her way into work when she received a call from Mr. Bettan. He screamed at her over the phone that she was late to work. When she arrived, she was called on the phone by Mr. Farsi and asked to come to the Green Room.

29. Once there, she was met by Mr. Farsi, Mr. Bettan, and the former assistant to HR, Kayla Patregoni.

30. Mr. Bettan told Graves that it seemed as if she was "too busy for a full-time job."

31. This appeared to be a clear reference to her association with her disabled father as a caregiver.

32. Mr. Farsi then said he thought she would be "happier working as a freelancer."

33. Then Graves told them she would not. When she asked if Mark Alfieri knew about the demotion, Ms. Patregoni said, "Yes."

34. Graves had a professional relationship with Mr. Alfieri and did not believe that he would demote her to a freelance position with fess pay and zero benefits, so she left the room to find him.

35. Once they talked, Mr. Alfieri said he would look into the matter. He told her to go home. She went to her desk and gathered her things in hopes that she would not be terminated. Ms. Graves did not know what her status was at BrandStar when she left that day.

36. Once Ms. Graves arrived home, she found that she no longer had access to work emails. Her health insurance was cut off the next week. She was not given the commission she had earned.

37. That Monday, Mr. Alfieri offered to pay Ms. Graves for a month as an at-home consultant, which she accepted. A week later, Mr. Alfieri sent an employee to Ms. Graves's house to collect her file folders, making it impossible for her to consult.

38. Plaintiff was effectively terminated on May 1, 2018, and formally terminated May 31, 2018.

## COUNT I

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

38. Plaintiff readopts and re-alleges paragraphs 1 through 38 above as if fully set forth herein.

39. The ADA specifically protects family members of disabled persons from discrimination on account of disability.

40. By firing her, the conduct of the Defendant discriminated against her as the caregiver for a close family member in violation of the ADA.

41. As a direct, natural, foreseeable and proximate result of the actions and inactions of Defendant, by- and through the actions and inactions of its managerial personnel, Plaintiff has suffered injuries and losses including a violation of her statutory rights, pain and suffering and extreme emotional stress; loss of ability to lead a normal life, all of which injuries and losses are continuing and permanent in nature.

WHEREFORE, Plaintiff prays for the following relief:

   a. Entry of a judgment for restitutionary, compensatory, and liquidated damages including, but not limited to, damages for emotional pain and suffering, anguish, injury of reputation and loss of capacity to enjoy life;

   b. Award Plaintiff here costs in this action, including reasonable attorneys' fees and expert fees as provided by the ADEA; and

   c. Any other equitable relief deemed appropriate by this Court.

## COUNT II

### VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT

(DISABILITY DISCRIMINATION)

42. Plaintiff readopts and re-alleges paragraphs 1 through 38 above as if fully set forth herein.

43. The conduct of the Defendant, by and through the conduct of its agents, deprived the Plaintiff of her rights under the Florida Civil Rights Act.

44. As a direct, natural, foreseeable and proximate result of the actions and inactions of Defendant, by and through the actions and inactions of its managerial personnel, Plaintiff has suffered injuries and losses including a violation of her statutory rights, pain and suffering and extreme emotional stress; loss of ability to lead a normal life, all of which injuries and losses are continuing and permanent in nature.

WHEREFORE, Plaintiff prays for the following relief:

   a. Entry of a judgment for restitutionary, compensatory, and punitive damages including, but not limited to, damages for emotional pain arid suffering, anguish injury of reputation and lass of capacity to enjoy life;

   b. Award Plaintiff costs in this action, including reasonable attorneys' fees and expert fees as provided by the FCRA; and

   c. Any other equitable relief deemed appropriate by this Court.

## COUNT III

## VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT

(INTERFERENCE)

26. Plaintiff readopts and re-alleges all allegations contained in Paragraphs I through 38 above as if fully set forth herein.

27. The Plaintiff was a FMLA qualified employee at the time of the events set forth herein for the forgoing reasons:

   a. She worked in excess of twelve months.

   b. She worked in excess of 1250 hours in the previous rolling calendar year.

    c. BRANDSTAR has over 50 employees who work within seventy five miles of Graves's place of employment.

28. BRANDSTAR was aware that the sudden illness and surgery sustained by her father was a FMLA qualifying event.

29. BRANDSTAR, despite having a human resources department which had specific knowledge of Plaintiff's eligibility for the FMLA, never sought to advise Plaintiff of her rights under the FMLA.

30. The Defendant violated FMLA and interfered with Plaintiff's rights under FMLA when it terminated Plaintiff on May 31, 2018.

WHEREFORE, Plaintiff prays the following relief:

a) For the entry of a judgment for damages against the Defendant for damages including back pay, benefits, accrued seniority, medical expenses, cost of job searches, liquidated damages, and attorney's fees;

b) Plaintiff further prays for the entry of a judgment declaring the Defendant violated FMLA, together with an order of reinstatement or in the alternative front pay;

c) Any such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury as to all issues so triable as a matter of right.

BY: */s/ G. Ware Cornell, Jr.*
G. Ware Cornell, Jr.
Fla. Bar No.: 0203920
ware@warecornell.com

**CORNELL & ASSOCIATES, P.A.**
2645 Executive Park Drive
Weston, Fla. 33331
Tel: (954) 641-3441